## ISHERWOOD et al. v. NEWPORT NEWS SHIPBUILDING & DRY DOCK CO.

(District Court, E. D. Virginia. November 2, 1922.)

No. 13.

**1. Reformation of instruments ⊜⇒45(2)—Evidence held not to show mutuality of mistake.**

Omission from a contract prepared by complainant, through inadvertence of the copyist of a material provision which complainant intended to incorporate therein, *held* not to entitle complainant to its reformation; the evidence being insufficient to show that the mistake was mutual or known to defendant, or that defendant would have signed the contract if it had contained such provision.

**2. Reformation of instruments ⊜⇒20, 45(2)—To warrant reformation for mistake of one party, evidence must clearly establish fraud and error.**

To authorize reformation of a contract for mistake of one of the parties, fraud must be shown, and the evidence must be clear and convincing, and lead unmistakably to the certainty of error.

**3. Patents ⊜⇒219(2)—That licensee furnished the invention for use of United States no defense to suit for royalties.**

Act June 25, 1910, as amended by Act July 1, 1918 (Comp. St. Ann. Supp. 1919, § 9465), providing that, wherever a patented invention shall be used or manufactured by or for the United States "without license of the owner thereof or lawful right to use or manufacture the same," the owner's remedy shall be by suit against the United States in the Court of Claims for recovery of reasonable compensation, has no application where the invention is furnished for use of the United States by a contractor who is a licensee under the patent, and is no defense to a suit by the owner against the licensee for royalties under the license contract.

**4. Patents ⊜⇒218(4)—Ships built by licensee under patent for method of ship construction held within the patent and subject to royalties.**

Ships built by a licensee under patent No. 1,029,546, for a method of ship construction, *held* within the terms of the patent and subject to royalties under the license contract.

In Equity. Suit by Joseph W. Isherwood and others against the Newport News Shipbuilding & Dry Dock Company. Decree for complainant in part.

Howson & Howson, of New York City, Meredith & Meredith, of Richmond, Va., F. P. Fish, of Boston, Mass., and T. A. Witherspoon, of Washington, D. C., for complainant.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

R. G. Bickford, of Newport News, Va., Sheffield & Betts, of New York City, G. S. Ferguson, Jr., of Washington, D. C., and F. H. Skinner, of Newport News, Va., for defendant.

Ramsey Hoguet, Sp. Asst. Atty. Gen., for the United States.

GRONER, District Judge. This is an equity suit begun by plaintiff, Isherwood, a subject of Great Britain, against the defendant shipbuilding company, a corporation of Virginia, with its principal place of business in the Eastern district thereof. The purpose of the suit is twofold: First, to obtain a reformation of a certain contract entered into between the parties, dated January 1, 1910; and, secondly, an accounting for royalties.

Defendant admits the execution of the contract, but denies plaintiff's right to reformation, and insists that, if an accounting is had, eight oil tank steamers, constructed for the United States government under a contract dated October 10, 1918, should be excluded upon the ground that plaintiff's right to claim royalties as to said vessels is a claim against the United States, which cannot be asserted nor maintained in this litigation, and likewise insists that ten certain other vessels constructed by it were constructed, not under plaintiff's license, but under the so-called Gatewood patent, and that therefore neither of these two classes of vessels should be included in an accounting.

[1] The facts, as shown, make out the following case: Plaintiff, Isherwood, in 1906 obtained an English patent for a system of ship construction, generally called the Isherwood system. Some time thereafter he applied to the United States Patent Office for a similar patent, which, at the time of the execution of the contract of January 1, 1910, was pending. On or about the latter date plaintiff and defendant began negotiations, the object of which was to secure to defendant a license to construct vessels under the Isherwood system and to this end plaintiff forwarded to defendant under date of December 31, 1909, a license contract of date January 1, 1910, clause 5 of which, as then drawn, was as follows:

"In the event of any license being granted to any other shipbuilder on the *east coast* of the United States of America to build under the patent system of ship construction at a less rate than five shillings per ton gross, the royalties to be paid by the licensees shall be correspondingly reduced." (Underscoring mine.)

The proposed contract granted to the licensee the right to use the invention in the construction of vessels at its yards at Newport News *or elsewhere in the United States*. Defendant, upon receipt of the proposed license contract, through its then general manager, W. A. Post, now deceased, advised plaintiff that an examination of the license disclosed "some features in which it may fail to reasonably protect our interests with respect to competition with other shipbuilders in this country," and pointed out changes which it desired made in a number of other respects. These criticisms were made in accordance with the numbering of the paragraphs of the contract, and, as relating to paragraph 5, was as follows:

"We invite your attention to the fact that we are liable to be in competition with other shipbuilders of the United States besides those on the east coast."

And further, by way of comment upon the suggested changes, defendant's letter concludes:

"You appreciate, of course, that, in offering the changes as above outlined, we are in no way desirous of taking any advantage of yourself, but, having a keen appreciation of the competitive conditions obtaining in this country, we feel that the above changes are necessary to properly protect us under conditions of competition with other shipbuilders which may arise," etc.

Defendant, with this letter, forwarded to plaintiff a revised form of license, in which section 3, not material to an understanding of the case, was wholly omitted, and section 5, redrawn as section 4, was left as drawn by plaintiff, except that the words "*on the east coast*" were omitted, and the words "correspondingly reduced" changed to "immediately reduced," the effect of which was to make the reduction apply in favor of defendant in the event a lesser rate was granted to any other shipbuilder *anywhere in the United States*.

Defendant's letter and redraft of contract were received at plaintiff's office during his absence on the continent, and perhaps two months elapsed before the matter was brought to his attention; but in the latter part of March, 1910, he wrote defendant enclosing a third form of license, embracing many of the changes and modifications suggested by it, incorporating two new clauses, and changing others. Among the changes so made was a provision, not found in the first grant of the license, whereby the right of the licensee to use the system on the Great Lakes was denied. Paragraph 4, however, was left as submitted in defendant's draft, except that its provisions were limited to vessels of 1,500 tons and upward. The redrafted license contract, as forwarded in the letter last mentioned, was accepted by defendant, duly executed by it and returned to plaintiff, and is the contract on which this suit is based.

About two years after the execution of the agreement between the parties a controversy arose between them, and in an effort to adjust their differences several interviews were had between plaintiff and representatives of defendant. In one of these interviews it developed that plaintiff had granted licenses to shipbuilding companies operating on the Great Lakes at lower rates than 5 shillings per ton gross. Upon obtaining this information, defendant insisted that, under clause 4, referred to above, it was entitled to a similar concession, and declined to make any settlement with plaintiff except upon his admission of this right. Plaintiff, on his behalf, denied the right of defendant to a reduction from the 5-shilling rate, upon the ground that there had been inadvertently omitted from clause 4 of the contract the words "Great Lakes excepted," the effect of which, if contained in the clause, would have left plaintiff free to establish, without affecting the agreed rate in the contract, such rates as to shipbuilding on the Great Lakes as he might desire; and one of the purposes of this suit, as already remarked, is to obtain this reformation of the contract.

In support of this position, the evidence of plaintiff and his clerk was taken in open court, and this evidence shows that when plaintiff returned to his office, from the continent, and found the letter and redraft of his first form of contract, which had been forwarded by de-

fendant, he examined the latter and interlined and corrected it in accordance with his views as to what it should contain, and, as thus changed, handed it to his typist for the purpose of having clean copies made. The copies thereafter produced by his clerk were submitted to and examined by him, and, with some interlineations inserted in his own handwriting, were executed by him, and one copy forwarded, in a letter, to defendant, in which he said:

"I inclose new form of agreement for your consideration and have the following remarks to make thereon and also in regard to the points as numbered in your letter."

And then followed his comments on the various amendments, suggestions, and omissions made by defendant to the draft first submitted, under headings similarly numbered as by defendant. Under clause 5 he said:

"I must retain an entirely free hand in regard to 'the Great Lakes' as I may dispose of the rights for the Great Lakes; otherwise I agree to your suggestion."

As has been already shown, defendant, upon receipt of the contract accompanying the letter last referred to, executed the same, and returned it to plaintiff in a letter in which, among other things, it said:

"I have signed the agreement in view of the provisions now set forth therein, and the assurances given in your letter of the 23d ultimo."

Plaintiff has exhibited in court the original draft of agreement forwarded to him by defendant, on which appears the interlineations carried into the final draft. On the paper, in paragraph 4 at the appropriate place, there appears in the handwriting of plaintiff, the words "Great Lakes excepted." No other explanation is made of the failure to carry these words into the final draft than the neglect of the clerk who made the copy. The latter testified that the original draft was in his possession from the time the copy was made until some two years later, when the error was first discovered. He is, of course, unable to say that the words which now appear thereon were, in fact, there when he used the same as copy for the final draft. But this the plaintiff, himself, insists was the case, and there is neither evidence nor inference upon which a contrary finding may be based. It is remarkable, it is true, in view of the insertion of these words in various other paragraphs, that they should have been omitted in perhaps the most vital of all the paragraphs to which they had relation; but it is a fact of common knowledge that even the most prudent and careful persons sometimes do omit vitally important parts of prepared papers and agreements, with no more apparent reason or excuse than obtains in this case, and when such a condition occurs it is not subject to any severer criticism than that it is an act of negligence, rather than fraud. A careful consideration of the evidence has therefore led me to conclude that it was the intention and purpose of plaintiff to include the words "Great Lakes excepted" in the paragraph in question, and this brings me to consider if the mistake thus made in their omission was mutual. Plaintiff insists that it was, and in justification of this position relies largely upon the quoted paragraph from his letter of March 23d, forwarded with the final draft, in which he stated:

"I must retain an entirely free hand in regard to 'the Great Lakes,' as I may dispose of the rights for the Great Lakes; otherwise, I agree to your suggestion."

It may be safely assumed, in the light in which the matter now develops, that this statement of plaintiff's position was in answer to the paragraph of defendant's letter, similarly numbered, in which it invited attention to the fact of competition with other shipbuilders of the United States besides those on the east coast, and which, of course, was intended to explain its position with reference to the elimination of the words "east coast" from the original draft of contract, and therefore it is insisted that defendant must have understood the purpose of plaintiff to be to reserve to himself the right to grant licenses to shipbuilders on the Great Lakes without thereby giving defendant the right to demand a reduction of the contract rate. If a fair and reasonable interpretation of the language so used, together with the other conditions then obtaining, makes this conclusion inevitable, then the question is foreclosed in plaintiff's favor; but with due regard to the rule of law applicable under such circumstances, I am unable to agree that this conclusion necessarily follows. Defendant's representatives who acted for it are, without exception, now dead. That they would have denied such an understanding of the contract may be, however, safely assumed from the fact that Mr. Hopkins, who at the time of the execution of the contract was defendant's general manager, and who, presumably, was conversant with its terms, and who was alive when defendant's answer was filed, made affidavit to the same, denying that defendant so understood the contract. The question, however, should not be made to rest upon the position of either party subsequently asserted, but should rather be answered by reference to their respective positions as disclosed by their written words at the time the contract was negotiated.

With plaintiff's letter there was enclosed a contract, duly executed by him, and redrawn by him after full consideration of the objections made by defendant to the draft first submitted. By reference to this defendant would have seen that plaintiff had, in the granting clause, excluded its right to use his patent on the Great Lakes; that he had, likewise, provided in other clauses that he should have the right to issue licenses for the construction of vessels under 1,500 tons without accountability to defendant; that he had reserved the right to issue licenses for the construction of vessels of special design on the *Great Lakes* without accountability to defendant; and that he was not to be answerable to defendant, nor was the contract between them to be affected, if infringement of his rights should occur by the unauthorized use of his patent on the *Great Lakes*. All of these exceptions, thus imposed, were inserted in the final draft of contract submitted by him, but were absent in the original. It likewise must have appeared to defendant that paragraph 4 of the contract (originally paragraph 5) had been redrawn by plaintiff, and its terms restricted, as above noted, to vessels of 1,500 tons and over. Most, if, indeed, not all, of these reservations were consistent with the purpose set out in the letter. Was there, then, anything in its terms to imply to a prudent person that this was not all? If plaintiff had said, "I

must retain the right to issue licenses to builders on the Great Lakes at such royalties as I am pleased to charge them, and the warranty in paragraph 4 in your favor is not, under such circumstances, to apply," such language would have been too plain for misinterpretation; but when he said, "I may dispose of the rights for the Great Lakes," he *may* have meant the same thing, but the language used was equally consistent with a purpose to sell, assign, or transfer the entire property rights of his contract to some person for use there for a cash consideration and without royalty at all. If he had done this, that is to say, if, in consideration of a certain sum of money, he had conveyed to some shipbuilder there his entire property in the patent, such a transfer would have been consistent with the language used, and, at the same time, would have violated none of the written terms of the contract. That the situation may have been so understood, and reasonably so understood, by defendant, cannot now be said to be fanciful or imaginary. Indeed, plaintiff himself even now seems to use the terms "sell" and "dispose" interchangeably. The contracting parties were business men of intelligence. Plaintiff's exclusive occupation, so far as is disclosed in the evidence, was in granting licenses to shipbuilders throughout the world and in collecting the royalties provided by such contracts. The form of contract which he was entering into contained no feature of novelty, but, in more or less identical language, had been executed with perhaps a hundred other corporations. It was redrawn by a clerk, himself so familiar with the business of his employer that he was enabled to and felt justified in making corrections and inserting such new matter as he believed helpful to his employer. Plaintiff himself carefully examined the contract, as is evidenced by additions in his own handwriting appearing on its face. As drawn, executed, and tendered to defendant, it contained, as defendant had demanded, an absolute guaranty of equality of opportunity with any other licensee in the use of the patent anywhere within the United States. That it would have been accepted and executed by defendant with this right qualified certainly nowhere appears directly, and such inferences as may be fairly drawn, it seems to me, negative this conclusion. In returning the first draft submitted by plaintiff, defendant said:

"We are liable to be in competition with other shipbuilders of the United States besides those on the east coast."

This language is omnibus, it includes the entire United States. If defendant had meant to exclude the idea of competition from shipbuilders on the Great Lakes it might easily have said so, and in such case, instead of eliminating the words "east coast" entirely, probably would have inserted the words "west" and "Gulf" in explanation of its meaning. Again, it said:

"Having a keen appreciation of the competitive conditions obtaining in this country," we feel that it is necessary in the protection of our interests that the same rate or royalty granted to "any other shipbuilder of the United States" should immediately be made applicable to us.

That it was subject, more or less, to competition from shipbuilders on the Great Lakes must be granted, for, while it is true that vessels

of great tonnage, such as were commonly constructed at the works of defendant, could not, by reason of the narrow channel from the Lakes to the sea, be constructed on the Lakes for use on the seaboard, it is equally true that defendant was by no means engaged alone in constructing vessels of large tonnage and size, but that a very considerable part of its entire business was in the construction of smaller vessels which, admittedly, could be built on the Lakes, pass through the canal and into coastal or trans-Atlantic trade. Whether its officers did, in fact, have this condition in mind in making the contract, or whether, in fact, they sought only protection from favored competition on the east coast, the west coast and the Gulf, it is now impossible to say, but enough appears to show that in their demand for a modification of the original draft of the contract they made no qualification. Plaintiff's answer to their demand in this regard was to send them a contract embodying their own language on this subject. To change its terms and read into it something which plaintiff negligently omitted, except upon convincing proof that it was so understood, is beyond the power of any court. That such convincing proof is absent, I think, must be conceded. Rather, it would seem to me that the exclusion of the right to defendant to build on the Great Lakes under the patent; the right reserved to plaintiff to make special concession in royalties to builders of vessels of special design or size on the Great Lakes without accountability to defendant; the exception of the Great Lakes from the right reserved to defendant to insist that plaintiff prosecute any person infringing his patent or refusing to pay royalty; the exception, likewise, of the Great Lakes from the obligation of plaintiff not to grant a lower minimum annual payment rate than is by the contract offered to defendant—may be reasonably considered to be in line with the announced intention of plaintiff to reserve a free hand as to the Great Lakes, and tend to accentuate the fact that defendant might, in the exercise of due care on its part, have been misled by these facts to the conclusion that these new provisions, inserted in the last, but not found in the first, draft, were alone in plaintiff's mind. And when to this is added the fact that the language of the letter is by no means free from ambiguity, as has been pointed out, and may have been, as it undoubtedly was, susceptible of being construed as a reservation of a right to *sell,* as distinguished from a right to grant a license, it follows that no conclusion can now be had the effect of which would be to charge defendant with knowledge of the omission, or that would justify me now in saying that, if apprised of the omission, defendant would have assented to the reservation and signed the contract.

[2] If the conclusions now arrived at be justified, then it follows that the prayer for reformation should be refused. Equity has jurisdiction to reform written instruments where there has been an unintentional omission of a material part of the contract, contrary to the intention of the parties, or under circumstances sometimes called mutual mistake. Equity may also reform written instruments where a mistake of one of the parties is sought to be taken advantage of by the fraud or wrongdoing of the other party. But so reluctant are the courts to undertake, in the lapse of time, to change agreements in

writing between parties competent to act, that it has been invariably held that such action is permissible only where fraud is clear, the mistake plain, and the proof unquestioned.   Many of the courts—indeed, most of the courts—hold that the measure of proof required under such circumstances is that which obtains in criminal cases, namely, proof beyond a reasonable doubt; but in no case is it held that any other proof than that which is convincing and plain, and that leads unmistakably to the certainty of error, is sufficient.   These propositions are fundamental, and require no citation of authority to support them, and upon this branch of the case the conclusion of the court is that plaintiff is not entitled to relief.   Having now disposed of the question of reformation of the contract, there remains to be considered the remaining two grounds of defense, which it is necessary should be determined in advance of an accounting.

[3] The first of these questions arose out of the claim of defendant that eight tank steamers built by it for the United States government should not be included in the royalty contracted for under the license granted by plaintiff to defendant.   The vessels in question were constructed under a contract made by the Secretary of the Navy, on behalf of the United States Shipping Board Emergency Fleet Corporation, with defendant, of date October 10, 1918.   Defendant insists that, in view of the Act of June 25, 1910 (36 U. S. Stat. at L. 851, c. 423), and the amendment of July 1, 1918 (40 U. S. Stat. at L. 705 [Comp. St. Ann. Supp. 1919, § 9465]), plaintiff's remedy, if any, is by suit in the Court of Claims against the United States.   The acts referred to read as follows:

"That whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the Court of Claims," etc.

And:

"That whenever an invention described in and covered by a patent of the United States shall hereafter be used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, such owner's remedy shall be by suit against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture," etc.

This defense may be disposed of summarily.   The unquestioned purpose of the two acts was to permit the use by or for the United States of any American patent, saving to the owner of the patent the right to indemnity by suit in the Court of Claims. But the use contemplated was in the exercise by the government of its right of eminent domain—the taking and the use of the patent without the consent of the owner, a situation analogous, in the case of an ordinary individual to an infringement, legalizing such infringement when done by or for the United States, with a right, as already shown, to the owner to compensation through suit in the Court of Claims.   The language of the acts negatives completely the idea that suit in the Court of Claims is necessary in a case in which the United States obtain the right to the use of the patent by contract, and equally in a case in which the right to its use for the United States is obtained by contract.   In the case

289 F.—19

at bar, the vessels were being built for the United States by defendant under a lawful contract with plaintiff for the use of his patent. It is not, therefore, a case in which the use of the patent was "without license of the owner thereof or lawful right to use or manufacture the same." To say that a contractor with the government, licensed to make or use a patent upon payment of royalty, should be released from obligation to pay the royalty, and the patentee forced to sue the government in the Court of Claims for compensation, because of a federal statute giving the United States the right to take it or use it without the owner's assent, would present a proposition unjustifiable either in law or morals and without foundation in the language of the quoted acts. No more need be said on this subject.

[4] The second ground of defense involves a more serious question. Defendant admits that, out of a total of 33 certain vessels built by it, 23 embody the invention of the Isherwood patent. Eight of the 23 were built for the United States, as just hereinbefore referred to, leaving 10 vessels, namely, the Charles Pratt, H. H. Rogers, William G. Warden, F. Q. Barstow, O. B. Jennings, J. C. Donnell, Agwistone, Agwismith, John B. Archbold, and William Rockefeller, which defendant now claims were constructed under what is known as the Gatewood patent, and which should, therefore, be excluded in determining the amount of royalty to which plaintiff is entitled. In other words, it is insisted by defendant that these so-called Gatewood ships do not embody the invention of the Isherwood patent; defendant's position, in a word, being that in their construction it has utilized merely the teachings of the prior art plus the improvement of Gatewood, and has not employed the arrangement specified in the Isherwood patent. Of the 10 vessels above mentioned, 8 were constructed on a plan identical in all respects, and 2 upon a somewhat different plan.

The defendant company obtained the right to the use of plaintiff's patent by contract dated January 1, 1910. Admittedly, as stated, it has constructed 23 vessels in accordance with the plans and specifications protected by this patent. Having used the patent, and having obtained the benefits of its use, defendant will not now be heard to declare its invalidity. Defendant, recognizing this well-established rule of law, has undertaken to so limit and restrict the patent as practically to confine it to a construction employing consecutive transverses having a regular spacing of the order of that found in the web frame system, that the transverses provided must be "consecutive" and must also be equally spaced, and contends that if, and when, these conditions do not obtain, as it is claimed is true of the ten vessels in question, there is not shown any use or infringement of the patent.

Isherwood's American patent was granted in June, 1912. Between the original application and the final granting of the patent there was a lapse of four or five years, during which period the application had the most careful scrutiny of the Patent Office, and the claims were several times modified to comply with Patent Office rulings. As finally granted, however, it provided a new method of ship construction by substituting for the web frame system, then in more or less general use, transverse frames having a depth and spacing substantial-

ly the same or greater than are the large transverse frames of the web frame system, and substituting for the intermediate framing of the web frame system a multiplicity of relatively small and closely spaced longitudinal frames. The advantage of the system is the saving of metal in the construction of the ship without impairing the strength or stiffness of the vessel. The transverse frames, the bulkheads and the longitudinal frames, in ordinary lay language, may be loosely described as forming the skeleton of the vessel. To these is riveted the skin or plating of the ship, forming the hull. During the period of wooden ship construction the practice was to build with vertical or transverse beams, more frequently called ribs, spaced a few inches apart according to the character of the vessel. Substantially the same system was followed after the introduction of iron and steel ships.

The first record of the introduction of the longitudinal system of framing was in the construction of the celebrated Great Eastern, built in 1858, in which vessel the framework of the ship was constructed of a number of continuous longitudinal girders, in combination with widely spaced transverse pieces of the same depth as the longitudinals, with as many bulkheads as there were breadths of the length of the ship. This framework was covered by an outer and an inner skin, or what may be described as a double bottom. The system employed on the Great Eastern was followed by her builder, with some slight modification, in one or two other vessels subsequently constructed, but at the time of the Isherwood patent the transverse or vertical rib system had again become universal. In ships of the type of the Great Eastern the longitudinal framing afforded the principal strength to resistance of the water and the strains to which the ship was subjected. In the Isherwood system the reverse is true. The longitudinals are subordinate or subsidiary to the transverses which furnish the principal resisting power. By doubling the depth of a girder, without increasing its thickness, its strength is increased many fold. This was the object which Isherwood had in mind—that is to say, by reducing the number of transverses and increasing their depth, to build a seaworthy vessel, with a saving of material and a very much greater cargo stowage capacity. The smaller longitudinals, closely spaced, resist longitudinal strains and generally reinforce the stiffness of the vessel. The Examiners in Chief, who, after much controversy, finally allowed the Isherwood patent, described its originality, and therefore its patentability, as follows:

"The next step in the development which we are tracing is the combination with the transverse frames, which have a depth and spacing substantially the same as the depth and spacing of the large transverse frames of the web frame system, and which are continuous and extend to the skin or deck, of a multiplicity of relatively small and closely spaced longitudinal frames also lying adjacent to the skin of the ship. It is in this step that the applicant passes beyond the prior art and its obvious suggestions, and it is upon this combination that the advantages of the applicant's ship over the ships of the prior art are believed to be fundamentally grounded. * * *"

That this construction embraces both novelty and value, is demonstrated by its general use, not only in this country, but in Great Britain

and Europe. Up to the present time more than 1400 ships, representing approximately 12,000,000 tons deadweight carrying capacity, have been constructed on this system, and, in a recent decision construing the Isherwood English patent, the High Court of Justice, Chancery Division, in an opinion, which was submitted to me in the argument, says:

The "Isherwood invention, like so many other great discoveries, is, when understood, of extreme simplicity—the step between failure and attainment a short one—the result of attainment almost epoch-making. It is a remarkable example of 'the little more' and 'the little less,' and, as might be expected, it had as forerunners many an untried or unsuccessful effort in the same field of invention superficially similar to itself, and presenting perhaps after its publication the appearance even of anticipation."

As has been already stated, defendant, admittedly, used the system in the construction of 23 vessels built by it. It claims that through a patent issued to its chief engineer, Mr. Gatewood, it has, through the use of the prior art, principally as shown in the Great Eastern and Annette class of ships, and the improvements discovered by Gatewood, been able to construct 10 other ships without infringing upon Isherwood's plan. Eight of the vessels so constructed by it are identical, and of which the Charles Pratt is a typical example. The Pratt class of steamers are all oil tankers. The hold of the vessel is divided into tanks, separated by bulkheads; each compartment being 28 feet long. In each compartment a single transverse was employed, spaced 14 feet from the bulkheads. Brackets were used at the intersection of the longitudinals with the transverses and with the bulkheads, thus furnishing additional support for the longitudinals. Mr. Gatewood describes the purpose of the bracket as an integral part of the longitudinal, instead of a part of the transverse or a part of the bulkhead, creating thereby "a beam reinforced at the end by the bracket," permitting "a much longer spacing between bulkhead and transverse" for the same size of longitudinals than is possible under the Isherwood plan, thereby insuring the same result with the elimination of one or two additional transverses for each compartment.

Gatewood claims as an advantage for his method of construction the saving in weight both of transverses and longitudinals. This is accomplished by making the one transverse two inches deeper than either of the two would be, if two were used as he says would be the case if Isherwood's plan were followed, thereby increasing the strength, by the greater depth of the one, without materially increasing the weight. To what extent there is an actual saving in the weight of material used by this method is seriously disputed in the evidence, and no satisfactory answer is to be found in the record; but, whether it be true or not, it seems to me clear that the method proposed is, at most, merely an extension or logical carrying out of the basic ideas of the Isherwood patent. Much was said in argument of the use of the word "consecutive" in the Isherwood patent, as indicating that his plan was that the transverse frames provided by him should be adjacent to one another; but it is equally consistent with the use of this word to replace or supplant the transverse frame with the bulkhead, and when

this is done the bulkhead frame takes the place of the transverse frame, and the same result is accomplished.

It cannot be contended, of course, that the Isherwood plan contemplated no bulkheads, for such a plan of ship construction would have been contrary to law, and it is beyond question that wherever the bulkheads were placed—in an oil tanker at comparatively short distances apart, and in a cargo ship at greater distances—the presence of the bulkhead was intended by Isherwood to accomplish the objects and purposes of the transverse. It is likewise contended that the use of the brackets, shown in the Gatewood design, introduced a new element which, in itself, negatives the "consecutive" theory to which it is claimed Isherwood is bound; but the argument is without merit, because not only are brackets provided for in Isherwood's specifications, but it is certainly reasonably clear that the brackets are really parts of the longitudinals, connecting and fastening the ends of the longitudinals where they reach and abut the transverses or bulkheads. It may also be properly remarked that in the early part of their negotiations plaintiff furnished defendant plans for government colliers to be constructed on his system, which show in the forward part of the vessels, but one transverse between the two bulkheads, with brackets at the bulkheads, substantially as shown in the so-called Gatewood ships.

Conceding, therefore, that the design of the Charles Pratt possesses advantages over the Asche type of vessel, one of the class admittedly under the Isherwood system, it does not follow that the basic principles of the Isherwood system were not used; but the contrary it seems to me, is clearly the case, unless it be held that the patent is wholly without merit and completely anticipated by the prior art, and this, in view of all that has been said is, of course, impossible. The remaining vessels claimed not to have been constructed under the Isherwood system are of the class known as the William Rockefeller class. The Rockefeller, a tanker of 20,000 tons, with large tanks, 34 feet 6 inches from bulkhead to bulkhead, is constructed with *two* transverse frames in each bulkhead—a lesser number, it is claimed, than would have been possible if Isherwood's plan were followed. These transverses are 10 feet apart, and are therefore 12 feet 3 inches from the nearest bulkhead. Defendant claims the novelty in the construction of this vessel grows out of the lack of uniformity in the spacing of the transverses—that is to say, that under the Isherwood system the use of the word in the patent "consecutive" means equal—and that therefore Mr. Gatewood has accomplished the saving of an additional transverse in these large tanks or compartments by spacing two of the transverses 10 feet apart and by adding 2 feet 3 inches to the distance between the transverses and the bulkheads, and supplying any deficiency of strength or resisting character thereby incurred by attaching the longitudinal to the bulkhead by the use of a bracket. He also claims, as in the case of the Pratt, a slight saving in metal.

A careful consideration of the Isherwood patent leaves no doubt that there is not contained in it any definite commitment that the spacings between transverse frames, or the frames and the bulkhead, must be of equal length. To hold that it is so restricted would be to read

into the patent conditions which are not to be found in its claims, and this no court may properly do. The bearing strength of the transverses, based upon the size and tonnage of the ship, is a matter of mathematical calculation, by formulæ well known to marine architects and engineers. If the transverses are spaced so widely as to reduce the factor of safety required below normal, the deficiency must be taken care of by some other method, and the use of brackets is shown by the evidence to have been the common and accepted method in this behalf. The method employed in the construction of the Rockefeller, it seems to me, is not distinguishable from the Isherwood construction in any material respect. It has all the features of the Isherwood design, and, at best, is but a forward step predicated, however, upon the general basic principle of the Isherwood design. So far as I am able to determine the differences which exist in the construction of the Rockefeller, when compared with the Asche, grow out of an effort to avoid the conditions of the patent, while at the same time employing its basic features. This cannot be done without infringement. The cases so holding are numerous and the principle is really not contested.

The suggestion was made in argument, and is repeated in the brief, that the court should consider, in determining the questions involved in this case, the circumstances under which Isherwood obtained his patent in the United States. It is said, in effect, that his application was in fraud of the rulings and regulations applicable in such cases. Whatever the facts may be in this respect, the question of his rights under his patent is not here in issue. That the patent was granted to him is admitted. That its use was secured to defendant by a contract is likewise admitted. His right to it is a question which can be raised by the United States, by proper proceeding in the proper tribunal, and since the United States are themselves, perhaps, the largest contractors for ships in this country, it may be safely assumed that, if proper ground exists for revocation, proper action will be taken.

In view of what has been said, a decree will be entered, on presentation, denying plaintiff's prayer to relief on reformation, granting an injunction against further construction by defendant under the contract, without first submitting plans to plaintiff for approval, as is provided by the terms of the contract, finding defendant liable for royalties on all the vessels embraced in the litigation, on the basis of 5 shillings per gross ton up to the date of the license to the American Shipbuilding Company, and thereafter on the basis of 3 shillings, the license to the Pittsburgh company of a lesser rate than 3 shillings per ton not being within the terms of section 4 of the contract, and the cause will be referred to a master for an accounting.